IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MICHAEL CHASE                                                                                    PLAINTIFF

V.                                                              CIVIL ACTION NO.: 3:14-cv-581-HTW-LRA

IVAN DIETRICH AND NORCO                                                                DEFENDANTS
CORPORATION

## MEMORANDUM OPINION AND ORDER

Before this Court is a Motion for Reconsideration [Docket No. 94] filed on October 3, 2016, by Plaintiff Michael Chase ("Plaintiff"). Plaintiff filed this Motion following this Court's Order to Dismiss with Prejudice [Docket No. 89] and Final Judgment [Docket No. 90] in favor of Defendants Ivan Dietrich and Norco Corporation filed on September 22, 2016. The motion requests that this Court reconsider its dismissal of Plaintiff's case, and asserts that the Court abused its discretion by dismissing this case with prejudice.

## FACTS AND PROCEDURAL HISTORY

This matter arises out of a motor vehicle accident that occurred on Sunday, January 19, 2014, on Interstate 20 near Meridian, Mississippi. Chase was driving a 1999 Mercury Villager, and Dietrich was driving a tractor-trailer owned by Norco Corporation. The accident involved Dietrich colliding with Chase, causing damage to both vehicles. Medical records indicated that Chase's whole blood alcohol content tested after the collision was 0.325 grams of alcohol per 100 milliliters of blood, which is more than four times the legal limit of 0.08 grams per milliliter. Chase allegedly was also driving at a speed of seven to ten miles per hour when the collision occurred, and was driving with a deflated right rear tire, causing him to move along the highway

in an erratic and unsafe manner, determinations he disputes.

Defendants filed their Motion to Dismiss [Docket No. 51] on May 1, 2015 based on Chase's failure to comply with the Federal Rules by providing false testimony under oath. Such testimony includes:

- False statements under oath concerning how much alcohol Plaintiff had to drink in the twenty-four hours preceding the collision;
- False statements under oath concerning how fast Chase was driving at the time of the collision;
- Repeated false statements under oath concerning Chase's history of driving under the influence of alcohol;
- False statements under oath regarding the status of Chase's driver's license and his history of other traffic citations; and,
- False statements under oath concerning his verified interrogatory responses.

This Court, after reviewing these instances of false testimony by Chase, determined that dismissal with prejudice was warranted, as explained to the parties during a telephonic hearing conducted by this court on September 20, 2016. The Court's Order granting the motion to dismiss [Docket No. 89] was entered on September 22, 2016. Plaintiff now asks this Court to reconsider its ruling.

## **DISCUSSION**

The Court is not persuaded by Plaintiff's assertions. A federal district court is authorized by Rule 41(b) to "dismiss an action or claim of a party that fails to prosecute, to comply with the

Federal Rules, or to obey an order of the court, Fed.Rule Civ.Proc. 41(b)[.]" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 62, 111 S. Ct. 2123, 2142, 115 L. Ed. 2d 27 (1991) (emphasis added).

The Fifth Circuit has stated that it "ordinarily will affirm a dismissal with prejudice only if: (1) there is a clear record of delay or contumacious conduct by the plaintiff, and (2) lesser sanctions would not serve the best interests of justice." *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011.) The Fifth Circuit will only reverse this Court's decision if it finds an abuse of discretion. *Brown*, 664 F.3d at 76. In affirming these cases, the Fifth Circuit has dismissed many cases with prejudice that have involved the presence of one or more of three "aggravating factors": (1) the delay or failure to comply is attributable directly to the plaintiff, rather than his attorney; (2) actual prejudice to the defendant; and (3) the delay or failure to comply is caused by intentional conduct. *Callip v. Harris Cnty. Child Welfare Dep't.*, 757 F.2d 1513, 1519 (5th Cir. 1985). The Fifth Circuit also considers dismissal with prejudice a more appropriate sanction when the conduct in question is that of the plaintiff, not the attorney. *Brown*, 664 F.3d at 77 (citing *Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 749 (5th Cir.1987)).

Contumacious conduct, as explained by the Court, is shown by a lack of respect for the Court or the Rules governing the judicial process and procedure. *McNeal v. Papasan*, 842 F.2d 787 (5th Cir. 1988) ("[I]t is not a party's negligence—regardless of how careless, inconsiderate, or understandably exasperating—that makes conduct contumacious; instead, it is "the stubborn resistance to authority" which justifies a dismissal with prejudice."). Intentionally lying under oath, as Plaintiff did in our present case, constitutes contumacious conduct necessary for district courts to appropriately dismiss a plaintiff's entire case as a sanction. *Brown*, 664 F.3d at 77–78

(affirming district court's dismissal with prejudice and agreeing that "This [oath] is not trivial. The proper administration of justice depends on people testifying truthfully under oath.").

On June 15, 2017, this Court heard oral arguments on this Motion for Reconsideration of this Court's previous Order Granting Dismissal with Prejudice [Docket No. 89] The Court previously dismissed Plaintiff's case with prejudice due to Plaintiff's lying under oath during his deposition and intentionally providing false testimony in his interrogatory responses. Plaintiff, in arguing for a reconsideration, provided no evidence of anything other than willful and contumacious conduct warranting dismissal, as the Court previously held. Plaintiff offered no evidence of any abuse of discretion by the Court, and as such the Court follows the jurisprudence by the Fifth Circuit and is persuaded to deny reconsideration of its previous ruling.

The most pertinent instances of Plaintiff's conduct follow below.

### I. False Testimony Regarding Plaintiff's Other Traffic Citations

Plaintiff's testimony in response to questions about his prior traffic citations leads this court to agree that Plaintiff has intentionally lied under oath in the discovery process. During his deposition, Plaintiff was asked if he had ever received any other traffic citations other than the DUIs previously discussed, to which he firmly replied that he had not:

> Q. Other than the -- your past DUIs, have you ever received any traffic tickets?
> A. No.
> Q. None?
> A. No.
> MR. EVANS: Be absolute certain. If you have, you better tell him.
> THE WITNESS: No.

[Pl.'s Dep. at 196:19-197:1.]

It was later discovered by Defense counsel that Plaintiff had at least fourteen (14) traffic citations other than DUIs, a partial listing is as follows:

- On October 19, 2007, he was ticketed for No Driver's License and Careless Driving in Newton County (the charges were ultimately dismissed).

- On August 29, 2009, he was ticketed for No/Expired Driver's License in Scott County. He was found guilty and fined.

- On January 25, 2011, he was ticketed in Newton County for No or Expired Inspection Sticker, Speeding, No Driver's License, and Possession of Liquor. The Inspection Sticker charge was dismissed. Plaintiff was found guilty of the remaining charges and fined. He never paid the fines and there is an active warrant for his arrest.

- On April 2, 2011, he was ticketed in Newton County for No Driver's License. He was found guilty and fined, but never paid the fine. There is an active warrant for his arrest in connection with this charge.

- On February 5, 2013, he was ticketed in Scott County for Possession of Liquor/Whiskey, Careless Driving, No Motor Vehicle Liability Insurance, No/Expired Driver's License, Switched Tag and Seatbelt Violation. He was found guilty of each charge and fined.

[Docket No. 51, Exhibit 5].

Plaintiff's counsel argues that because many of these traffic citations were issued in conjunction with the DUIs, Plaintiff simply couldn't remember them as separate instances. Due to his history of alcoholism and the head injury Plaintiff sustained during the accident, his counsel argues, Plaintiff's failure to remember these citations separate from his DUIs cannot be proof of intentional fabrication, and such failure is not material to the issues in this case. In his response to Defendant's motion to dismiss, Plaintiff includes an affidavit of his girlfriend stating that he has displayed problems with his memory following the incident. [Docket No. 64, Exhibit 2]. Plaintiff, however, does not include any medical report from a licensed physician stating that the injury sustained in the incident caused him to suffer memory loss preventing him from being able to fully answer his deposition questions.

Importantly, the Defendant points out that while Plaintiff asserts that his inconsistent answers are due to a loss of memory and not intentional fabrication, he does not have any problem remembering other specific details about the incident, namely:

- He was driving "45, maybe 50" miles per hour at the time of the accident, and specifically remembers looking at his speedometer because he didn't want to get pulled over for speeding. (Pl.'s Dep. at 151:22-152:13; 182:8-14; 183:3-9.)

- He knew he wasn't driving on a rim with no tire at the time of the accident, "to his knowledge" and denied driving his vehicle on a rim the night of the accident (even though his own expert witness says he was). (*Id.* at 178:6-11; 179:14-16.)

- He saw the 18-wheeler driven by Dietrich when the 18-wheeler was about 100 yards behind him, specifically remembers looking out the mirror on his left side; remembers that there was no vehicle next to Chase; no vehicle next to Dietrich; looked up again and there was a vehicle 50 yards behind him; then the next thing he heard was the sound of the collision. (*Id.* at 179:17 - 180:14.)

- Remembers that he was not driving his vehicle partially in the emergency lane (even though his own expert witness says he was). (*Id.* at 180:15 – 19.)

- Remembers that he was in his lane just before impact. (*Id.* at 180:22-25.)

- Remembers how quickly the 18-wheeler approached him from the rear and even specifically which mirror he looked in to see the truck approaching. (*Id.* at 181:10-20.)

- Remembers the specific sequence of which mirrors he looked at and when just before the accident: first the rear view, then the door mirror to check the left lane, and finally looked in the rearview mirror again just before impact. (*Id.* at 181:17 - 182:5.)

- Remembers that that tractor trailer's lights were on low beam. (*Id.* at 185:5-13.)

- Remembers hearing the truck blow his horn before impact. (*Id.* at 185:18-24.)

- Remembered feeding dogs before he left to go to York, Alabama, to the "hole in the wall" lounge where he was drinking. (*Id.* at 109:7:12.)

- Remembered that, before he left to go to York, one of his fiancée's daughters was not home from school yet, but that his fiancée's other child was home. (*Id.* at 109:14-16.)

- Remembered that he gave an acquaintance $23, "with taxes and all" to buy a half of a gallon of gin. (*Id.* at 112:17-20; 115:19-20.)

- Remembers that he ate a chicken and a biscuit for breakfast the morning before the accident, but that he had no lunch or dinner. (*Id.* at 125:10-24; 129:4-11.)

[Docket No. 99, pp. 20-21].

Plaintiff's selective memory, as exhibited in his deposition, is not favorable to his asserted defense of memory loss, and the Court is not persuaded by this assertion that Plaintiff was not intentionally lying under oath.

## II. <u>Plaintiff's False Testimony Regarding the Status of Plaintiff's Driver's License</u>

Plaintiff's testimony regarding the status of his driver's license is particularly important to the Court's determination that Plaintiff intentionally lied under oath. Throughout his deposition, Plaintiff gave different accounts as to the status of his driver's license, before finally admitting that he had never obtained a driver's license from any state, much less a valid license from Mississippi:

> Q. Do you have an old driver's license?
> A. No. I have an ID.
> Q. All right. Can I—can I see your ID?
> Witness complies.
> Q. Thank you.
> Mr. Robinson: Can I get a photocopy of this in a little bit, Don?
> Mr. Evans: Yeah. I – let me – let me hand it to somebody and tell them to go get it.
> Mr. Robinson: All right. Thank you.

> By Mr. Robinson:
> Q. Mr. Chase, why don't you have a driver's license?
> A. It's been suspended, taken from me.
> Q. Why was your driver's license suspended?
> A. Due to a DUI.
> Q. Okay. When was your driver's license suspended for the DUI you're mentioning?
> A. Last year or a year and a half, two years ago- -
> Q. All right.
> A. -- if not more.
> Q. Was that in connection with this accident or – or another occasion?
> A. No. With this accident.
> Q. Have you made an application to – to get a new driver's license?
> A. No I just re—had to go to a class, and you have to pay a $100 reinstatement fee, which I didn't have to pay.
> Q. So you're saying that this driver's license—you're saying that you had a valid driver's license at the time of this automobile accident?
> A. No.
> Q. Why did you not have a valid driver's license at the time of this automobile accident?
> A. It'd been taken.
> Q. So it had been taken away before this accident?
> A. Correct.
> Q. All right. And that was in connection with another DUI, correct?
> A. Correct.

Pl.'s Dep. pp. 12, 13.

Later, Plaintiff would change his story again regarding his driver's license as a result of a DUI he received in Forest, Mississippi, in 2012:

> Q. Okay. Were you convicted of DUI?
> A. No.
> Q. Well, why did they take your license then?
> A. Well, when they give me a DUI, I had to go to court and pay a fine.
> Q. Uh-huh. (affirmative response).
> A. So that's as far as I know.
> Q. All right. And did they also take your license then?
> A. Yeah.

Pl.'s Dep. p. 18:2-12.

Plaintiff's testimony changes again later in the deposition, when he stated that his license

8

had already been taken from him in 2007 or 2008:

> Q. Okay. Were you charged with DUI on that occasion, that second incident that we're talking about?
> A. Yeah.
> Q. All right.
> A. And I had a fine, yeah.
> Q. Did they take your license away then?
> A. Yeah.
> Q. After that second incident in 2007 and 2008, did you get another license?
> A. No.
> Q. I thought you told me earlier that your driver's license was suspended following that Scott County DUI in 2012.
> A. My license been suspended since the last DUI I had. Not the one in 2007, but the other- - the 2000—I'm not getting the dates right on the - - on the dates that the DUI have, but it was in 2008 or '09. But the one I had in 2012, the license was already gone.
> Q. That was my question.
> A. Right.
> Q. It was already gone—
> A. Yeah.
> Q. -- at that point.

Pl.'s Dep. p. 31:8-25; 32:1-7.

Plaintiff changes his testimony yet again:

> Q. Was your driver's license suspended following that first DUI in 2005?
> A. Yeah.
> Q. All right. Did you ever get another driver's license after that accident in 2005?
> A. No.
> Q. All right. So as of the date of this accident in January 2014 - - I believe it's January 14th- - you hadn't had a driver's license for almost ten years?
> A. Correct.
> Q. You know it's illegal to drive without a driver's license, don't you?
> A. Yeah.
> Q. Why didn't you go get a new driver's license?
> A. I couldn't - - had the money to get it, and I just didn't get it because they put you through a time frame with them.
> Q. So what's wrong with the time frame?
> A. The time frame's not up. If I had one in 2012, they suspended my license for the next five years, I think it is, or ten years, something like that, because the third one. It might be indefinite.

9

Pl.'s Dep. pp. 38:15-25; 39:1-14.

Plaintiff then testified that he only had an expired driver's license from Boston, Massachusetts, which turned out to be an identification card, not a license:

> Q. Okay. One of the officers that investigated this accident advised me that you had several false driver's licenses with you at the time of this accident; is that true?
> A. No.
> Q. So if that officer testifies that, you're saying that he's testifying falsely?
> A. Right.
> Q. You didn't have any kind of fake driver's license with you- -
> A. No.
> Q. -- at the time of the accident?
> A. No. All I had with me is my—my license there, and I had my—my license that come from Boston that I brought down here with me over 15 years ago.
> Q. The license that came from where?
> A. Boston. That's all I had in my wallet.
> Q. Uh-huh (affirmative response). And it was expired, wasn't it?
> A. Yes. It's no good, but I just never threw it away.

Pl.'s Dep. pp. 40:5-25; 41:1.

Finally, Plaintiff admitted that not only did he not have a driver's license in Mississippi, he had never had a driver's license, period:

> Q. Have you ever had a driver's license?
> A. No. Not—not in this state here, no.
> Q. Have you ever had a driver's license, period?
> A. No.
> Q. How old are you today?
> A. Forty-nine.
> Q. Have you ever taken a driver's test?
> A. Yeah. I had a permit.
> Q. How old were you then?
> A. I had to be about 20—19, 20 when I got out of high school.
> Q. Why did you never get a driver's license?
> A. Never did.

Pl.'s Dep. p. 42:9-23.

> Q. As we sit here today, it's your testimony that you've never had a valid driver's license?
> A. Correct.

Pl.'s Dep. p. 43:6-9.

Plaintiff's counsel asserts that this only shows that Plaintiff has problems with his memory, and that his memory needs to be prompted. Plaintiff's purported confusion and memory loss, continues his counsel, should not serve as proof of willful, intentional lying warranting a dismissal of his claims.

The Court is not persuaded. Plaintiff repeatedly claimed during questioning that he did in fact have a license, but that it was suspended. Plaintiff continued to change his story as to when and how the license became suspended, and finally admitted that he never had a license. This is a clear example of an intentional lie, and Plaintiff's counsel cannot overcome this by asserting that Plaintiff's memory loss affected his testimony as to this matter, especially in light of Plaintiff's previously discussed "selective memory" regarding other specific details of the incident.

### III. <u>Plaintiff's False Testimony Regarding his DUIs and Past Criminal History</u>

Plaintiff's testimony regarding his DUIs also shows his pattern of intentionally lying under oath.

In Plaintiff's verified response to the interrogatories, he stated that he had only one (1) DUI in Scott County, Mississippi, and that it had been thrown out. [Docket No. 51, Exhibit 1]. Later, Plaintiff testified in his deposition that he actually had three (3) DUIs, one of which was thrown out:

> Q. All right. Have you ever been convicted or pled guilty to any type of crime?
> A. DUI and shoplifting.
> Q. All right. I'll ask you about the shoplifting in a little bit. Now, Mr. Chase,

have you had any other DUIs?
A. Yeah. I had—I had three of them total, yeah.
Q. And that's not counting this accident?
A. No. Not counting this accident, no.
Q. All right. Why did you say in your interrogatory responses that you could only recall one other one?
A. Recall other one?
Q. Yeah.
A. No. I—I had two but they had—what they call a record—throw one out. I would have had three, but they threw one—the one before this wreck was thrown out of court because, you know, get three; and I guess you wait until ho to a jury. But they—they end up throwing it away, so I think there's two on the record, I believe, but they were so long ago—they said after seven years, they go away.

Pl.'s Dep. pp. 19:6-25; 20:1-5.

Following this inconsistent sworn testimony, Defense counsel conducted a public records search of Plaintiff's DUI charges in Scott County and Newton County, Mississippi. This search showed that, in fact, Plaintiff has had five (5) DUI arrests, four (4) of which resulted in convictions and one of which is a felony DUI that has been turned over to the district attorney for presentation to the grand jury, none of which was thrown out. [Docket No. 51, Exhibit 5]. This is clear evidence of Plaintiff's intentional fabrication under oath regarding his history of DUIs.

Plaintiff also provided false testimony regarding his other convictions. It was discovered that Plaintiff had an arrest for shoplifting in Boston and was convicted of drug offenses in Boston, which he did not disclose in either his original or supplemental response to interrogatory number 12. [Docket No. 51, Exhibits 1 & 2]. Plaintiff's response to interrogatory number 12 stated that he had been "arrested for shoplifting more than 2 or 3 years ago." *Id*. at Exhibit 1.

Yet, in his sworn deposition testimony, despite being warned by Defense counsel that "when I ask you about your criminal record, you'd do well to tell me everything," Plaintiff admitted that he had been charged at least twice for shoplifting, once in Mississippi and once in

12

Boston; admitted that he was convicted for drug offenses for which he was incarcerated for a total of eight years in Massachusetts; and admitted that his interrogatory response raising the more recent Mississippi shoplifting did not disclose the Boston drug offenses or the Boston shoplifting:

> Q. So when I—when I ask you about your criminal record, you'd do well to tell me everything.
> A. Uh-huh (affirmative response).
> Q. You understand?
> A. Uh-huh (affirmative response).
> Q. All right. Have you had any other convictions beyond this shoplifting charge or conviction?
> A. In Boston over—maybe 35 years ago—25, 30 years ago, yeah.
> Q. What was that?
> A. I had my share of trouble in Boston.
> Q. Tell—tell me about the trouble you got into in Boston.
> A. Just drugs, shoplifting.
> Q. Because I'm going to look.
> A. Yeah. Drugs and shoplifting. That's all I been convicted for, drugs and shoplifting.

Pl.'s Dep. p. 44:3-21.

> Mr. Evans: Don't miss any. Tell every one of them.
> A. They're all just drug convictions.
> Q. All right.
> A. Drug convictions. And it might be a shoplifting conviction in there, but they mostly drug convictions.
> Q. You have more than one shoplifting conviction in Boston, didn't you?
> A. No. No.

Pl.'s Dep. p. 45:6-17.

> Q. Did you—you went to jail?
> A. Yeah. At the county jail—the city jail they call it here.
> Q. All right. And you paid your $25 and got out?
> A. Yeah.
> Q. Did you ever go to court?
> A. No.
> Q. Now, tell me what kind of drugs you were involved in.
> A. Cocaine, heroin.
> Q. All right. I want to know how many convictions you had for cocaine or heroin.

13

  A.  For all of them together, probably be about—had to be three.
  Q.  Uh-huh (affirmative response).
  A.  I'll—I'll say four on the safe side, but three because after three, that's your three strikes. You're out. Then they bound you over. So I've never been bound over. I always went to the little correctional facility. I didn't go to state—state penitentiary, no.
  Q.  All right. How many times did you have to go to the correctional facility?
  A.  Three.
  Q.  How much time did you spend in jail on these occasions?
  A.  First one would be six months. Then they went from six months to 18 months. Then went from 18 months to—I think it was 36 months or 42 months, something like that.

Pl.'s Dep. pp. 47:12-25, 48:1-17.

  Q.  And where did you serve your time?
  A.  At South Bay Correctional Facility.
  Q.  Is that in Boston?
  A.  Right.

Pl.'s Dep. p. 49:3-6

  Q.  How much total time would you say that you spent in jail while you were in Boston with respect to all these convictions?
  A.  Let me see. Close to eight years. I'll round it off. Maybe ten, but I don't think it was that much because they don't make you do all your time.

Pl.'s Dep. p. 49:13-19.

  Q.  All right. When you would have applied for employment with your employers, would you tell them about your past criminal record?
  A.  I don't remember, no. I don't think so, no.
  Q.  So if I go get those job applications—
  A.  No. I don't think—no. Because what I did is I didn't give them no information—I never been convicted in Mississippi, so I would say no because I've never been convicted in the state of Mississippi. So I didn't think Boston mattered.

Pl.'s Dep. p. 50:4-15.

  Q.  What year did that shoplifting incident occur in Boston?
  A.  Like I said, over 30 years ago. Had to be between the '80s and '90s.

>    Probably '92—'89, '92.

Pl.'s Dep. p. 56:9-13.

## IV. **Plaintiff's False Testimony Regarding his Sworn Responses to Interrogatories**

Plaintiff further provided false testimony regarding his sworn responses to the interrogatories, which are contradicted by his deposition testimony. Plaintiff's interrogatory responses bore his signature; stated that he was sworn; stated that the responses were true and correct; and stated that he signed the responses before notary

Katherine M. Bosquet on January 21, 2015. [Docket No. 51, Exhibit1].

However, at his deposition, Plaintiff was confronted with the contradictions between his interrogatory responses and his deposition testimony concerning his DUI's. During the courts of the deposition, Plaintiff testified that he appeared in Mr. Evans' office before Ms. Bosquet on January 20, 2015, not January 21, 2015 as stated in the verification, and that he never read the responses before he signed them:

> Q. Well, you answered these under oath, didn't you?
> A. No.
> Q. You didn't answer --
> A. I wasn't in front of nobody, no.
> Q. Let me look again. This is Exhibit 1. And it says here, "Personally came and appeared before me, the undersigned authority, and for the jurisdiction after said [sic], that within name Michael Chase, after first being duly sworn, stated on oath that the matters and things set forth and above and foregoing are true and correct as therein stated, January 21st." Is that your signature?
> A. Where did I sign these at?
> Q. You tell me.
> A. I don't remember signing that.
> Q. Is that your signature?
> A. Yeah.
> Q. Did you read any of the stuff that's attached that's stapled to that?
> A. I don't remember even getting this stuff, not necessarily hangs on it, no.
> Q. Flip -- flip through that document there and see tell -- tell us if you've read any

of that. I'm talking about all the questions and answers. Just pick up the whole document. Did you read any of that?

A. No.

Q. Take your time. Flip -- flip through the whole thing real quick.

A. No. I don't remember none of this. Not Bradford Martin.

Q. Uh-huh (affirmative response).

A. Whoever that -- unless they came in the hospital or something, but no. No.

Q. So before -- before you signed that, did you read any --

A. That's my signature.

Q. Uh-huh (affirmative response).

A. But I don't remember even signing it and where I signed it at.

Q. What's the date -- what's the date of that?

A. This is the 21st.

Q. That's yesterday, right?

A. Yeah.

Q. Were you drinking yesterday?

A. No.

Q. Did you appear in this office yesterday?

A. I did come in this office Tuesday. Wednesday I didn't leave my house. I stayed home all day the 21st, and I came here today. I have never signed nothing the 21st. I came here the 20th, which is Tuesday.

Q. Uh-huh (affirmative response).

A. Wednesday I didn't see these. And today, I'm here, 22nd.

Q. All right. So what -- whatever notary said that you appeared before her yesterday on January 21st, that's just wrong, isn't it, because you weren't here?

A. That's right.

Q. All right. Let me see that back.

A. I came to him on the 20th. I stayed home the 21st, and here I am now on the 22nd.

Q. All right. And for the record, it says Katherine Bouquet [sic], I believe, is the notary. And it's your sworn testimony today that you didn't sign this on January 21st, did you?

A. No.

Q. And this stack of papers that -- that we have here, Plaintiff Michael Chase's responses to defendant's first set of interrogatories, you didn't read the first page of this, did you?

A. No.

Q. Ever?

A. No.

Q. Not -- not yesterday?

A. Not yesterday.

Q. And not the day you came in here, did you?

A. The day I came in here, we -- on Tuesday, the 20th.

16

>    Q. Did you read any of this stuff then?
>    A. No.

Pl.'s Dep. pp. 22:11-25:22.

Plaintiff either falsely swore that he appeared before the notary public before reading and signing his interrogatory responses, or he lied about them in his deposition. Either way, Plaintiff has clearly lied under oath regarding his interrogatory responses and his deposition testimony.

V. **Plaintiff Has Failed to Provide Adequate Medical Reports Justifying His Assertions About His Memory**

Throughout the parties' briefing on this matter, Plaintiff's counsel has repeatedly asserted that due to Plaintiff's head injury as a result of the incident, Plaintiff has suffered severe memory loss and claims this as a defense to his inconsistent testimony in discovery. Plaintiff's only support for this contention in response to the Defendant's motion to dismiss was an affidavit of Plaintiff's live-in girlfriend, Pamela Cromer, who stated that she had noticed Plaintiff's memory loss following the incident. [Docket No. 64, Exhibit 2]. Plaintiff cites no medical report or authority on the matter until he filed his Supplemental Reply [Docket No. 101] to Defendant's response to Plaintiff's motion for reconsideration.

In this supplement, Plaintiff again asserts that the incident left Plaintiff with a head injury that caused sever memory loss, and does in fact attach medical records of doctors who examined Plaintiff following the incident. One of these medical records was prepared by Dr. Krishan Gupta, M.D. of Ridgewood Clinics, P.A. in Jackson, MS, who assessed Plaintiff for purposes of determining the extent of his memory loss, if any. The Court notes a particular assessment by Dr.

Gupta:

> "We do not have any baseline for comparison except what his girlfriend has told us which clearly indicates that the patient has experienced memory loss after the accident. He needs detailed neuropsychological testing which would help me understand the extent of his memory loss. He has a lot of anger, agitation, and impulsivity. We also want to evaluate him for frontal lobe syndrome which can occur after an accident like his. His UMC records do not reflect more details except that he had some memory problems, but he was not formally tested for this."

[Docket No. 101, Exhibit 2].

In reviewing this report, the Court cannot determine that Plaintiff suffered such extreme memory loss following the incident to justify his inconsistent testimony and, even so, not confirmed by his doctors. If he actually experienced memory loss, it was selective. Plaintiff was able to selectively remember specific details about other aspects of the incident, which leads this Court to question the validity of his contention.

Furthermore, Plaintiff's alleged memory loss fails to explain his outright fabrication that at one time he had a driver's license. Plaintiff repeatedly stated that he had a driver's license throughout his deposition, and even gave specific instances when he claimed it was suspended or otherwise taken from him. This fabrication continued throughout the deposition and changed with each question asked of Plaintiff, until he finally admitted that he had in fact never gotten a driver's license from any state, much less in Mississippi. This is clear evidence of Plaintiff intentionally lying under a sworn oath, the importance of which was apparently disregarded and ignored by Plaintiff.

The Court concludes on a segment of Plaintiff's earlier quoted testimony, evidencing unmistakably Plaintiff's mindset on the obligation to be truthful:

> Q. All right. When you would have applied for employment with your employers, would you tell them about your past criminal record?
> A. I don't remember, no. I don't think so, no.

> Q. So if I go get those job applications—
> A. No. I don't think—no. Because what I did is I didn't give them no information—I never been convicted in Mississippi, so I would say no because I've never been convicted in the state of Mississippi. So I didn't think Boston mattered.

Pl.'s Dep. p. 50:4-15.

Whether answering questions about his criminal record (only convictions were DUI and shoplifting before finally admitting an extensive record resulting in confinement of approximately eight years); the number of his prior convictions; how much he had to drink the day of the accident; and other matters bearing on his credibility, Plaintiff's evasiveness and outright fabrications persuade this Court, as a gatekeeper for the integrity of trials, that this lawsuit should not go forward with a Plaintiff who has shown so little respect for his obligation to answer questions truthfully. Accordingly, this Court is not persuaded by Plaintiff's excuse of memory loss. This Court declines to vacate its prior ruling that Plaintiff has intentionally lied under oath and, as such, this Court must dismiss his claims with prejudice.

## **CONCLUSION**

The Court, after hearing arguments from the parties and reviewing relevant jurisprudence, is persuaded to DENY the Motion for Reconsideration [Docket No. 94]. Plaintiff makes no new arguments of law in this motion and does not raise any facts sufficient to justify a reconsideration of this Court's previous Order. Therefore, this Court DENIES Plaintiff's Motion for Reconsideration for the reasons set forth in this Court's previous Order and Final Judgment on the matter.

**SO ORDERED AND ADJUDGED,** this the   30th   day of   September  , 2017.

                                            s/ HENRY T. WINGATE
                                            **UNITED STATES DISTRICT COURT JUDGE**